FILED
May 10, 2023
KAREN MITCHELL
CLERK, U.S. DISTRICT COURT

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

| | | |
|---|---|---|
| GEOFF WINKLER, RECEIVER FOR PROFIT CONNECT WEALTH SERVICES, INC., <br> Plaintiff, <br><br> v. <br><br> JEFFREY NICHOLAS, TROY SUTTON, AND ALLIANZ LIFE INSURANCE COMPANY OF NORTH AMERICA, <br> Defendants. | § § § § § § § § § § § § | CIVIL ACTION NO. 5:23-CV-00074-C |

**PLAINTIFFS' FIRST AMENDED COMPLAINT**

Plaintiff Geoff Winkler (the "Receiver"), acting solely in his capacity as the Court-appointed receiver for Profit Connect Wealth Services, Inc. ("Profit Connect") and its subsidiaries and affiliates (collectively, with Profit Connect, the "Receivership Entities"), hereby brings the following lawsuit against the above-captioned Defendants and, on behalf of the Receivership Entities, alleges as follows:

### I. Discovery Control Plan and Damages

Discovery in this case should be conducted under Level 2, pursuant to Rule 190.3 of the Texas Rules of Civil Procedure. Pursuant to Rule 47 of the Texas Rules of Civil Procedure, Plaintiff seeks damages in excess of $1,000,000.

### II. Parties

Plaintiff Geoff Winkler was appointed as the court-appointed receiver of Profit Connect Wealth Services, Inc. and any of its subsidiaries and affiliates in a civil enforcement action brought by the Securities and Exchange Commission against Profit Connect styled *Securities and Exchange Commission v. Profit Connect Wealth Services, Inc., et. al.*, Case No. 2:21-cv-01298 in

the United States District Court for the District of Nevada. Winkler brings this action solely in his capacity as the court-appointed Receiver, and not in his individual capacity.

Defendant Troy Sutton is a citizen of the State of Utah and can be served at his residence located at 2365 North 1000 East Provo, Utah 84604 or wherever he may be found.

Defendant Jeffrey Nicholas is a citizen of the State of Texas and can be served at 3003 County Road 7530, Lubbock, Texas 79423 or wherever he may be found.

Defendant Allianz Life Insurance Company of North America ("Allianz") is a Minnesota corporation with it principal place of business in Minneapolis, Minnesota. Allianz has been registered with the Texas Department of Insurance to engage in insurance transactions in the state of Texas during all relevant times herein. Allianz can be served through its registered agent CT Corporate System at its registered address 1999 Bryan Street, suite 900 Dallas, Texas 75201-3136.

### III. Jurisdiction and Venue

As a court of original jurisdiction, this Court has jurisdiction over the civil action brought by Plaintiff because all or substantially all the events subject of this suit occurred in Texas and the damages sought are within the jurisdictional limits of this Court.

This Court has both general and specific personal jurisdiction over Troy Sutton. Sutton has continuous and systematic contact with the State of Texas in that he has lived and worked in Texas. Additionally, Sutton recruited Nicholas, a Texas resident, to identify people in Texas to invest in Profit Connect. In furtherance of those efforts, Sutton met with individuals in Texas to have them invest in Profit Connect.

This Court has personal jurisdiction over Nicholas because he is a Texas resident doing business in the State of Texas.

This Court has personal jurisdiction over Allianz. Allianz conducts continuous and systematic business in the State of Texas and is registered to do business in Texas. In addition, Defendant Nicholas was acting as Allianz's agent at the time he advised some of his clients to liquidate annuities purchased through Allianz and invest the proceeds into Profit Connect.

Venue is proper in Lubbock County because all or a substantial part of the events or omissions giving rise to this lawsuit occurred in Lubbock County and one of the Defendants is a resident of Lubbock County.

### IV.   Background Facts

**A.   Profit Connect is formed to allegedly mine for bitcoin using supercomputers.**

In May 2018 Profit Connect was formed and held out to the public as a cryptocurrency mining company that had created and patented a series of "supercomputers" with locations in Pasadena, California and Las Vegas, Nevada. Profit Connect claimed and offered investors "seat time" on their supercomputers while it was mining cryptocurrency, which investors were told would earn 15-20% returns held in FDIC-insured accounts for whatever amount they invested. Profit Connect emphasized in its marketing materials that customer funds were not an "investment" and was not a "security" but characterized it as "an alternative option for their funds." Additionally, Profit Connect marketed itself not as a wealth services company but as an "artificial intelligence company."

Profit Connect used various products, primarily referred to as "Wealth Builder," "Wealth Builder Unlimited," "Wealth Builder VIP," and "VIP Executive," to promote and sell its products. Profit Connect also advertised on its website that it had a "monthly subscription" option in which an investor deposited a set amount each month, ranging from $50 to $1,000, with returns of 15% to 20% per year. On its website, Profit Connect actively encouraged investors to use money from

their retirement funds to invest with Profit Connect and included step-by-step instructions directing investors how to form a self-directed IRA.

Profit Connect promised investors on its website that its offerings include its "famous peace of mind money back guarantee" and represented that its "financial reserves are significantly higher than all of its seat purchaser's deposits combined." The Profit Connect website told investors that their funds were invested in sectors chosen by the Profit Connect "supercomputer" and the profits were then "deposit[ed] into [an] FDIC-NCUA Insured Profit Connect Cumulative Business Account" at Bank of America, Chase, Wells Fargo, and/or Navy Federal Credit Union. The Profit Connect website included purported official logos for each of these banks and Profit Connect referred to these financial institutions as "our banking association." The Profit Connect website had a chart showing that investors were not charged any fees for management, operating expenses, or other expenses. Profit Connect claimed it could achieve these results because this was not an "investment" per se; investors were buying time or a "seat" at the supercomputer where bitcoins could be mined.

### B.    Profit Connect enlisted promoters, who were paid via a multi-level marketing scheme, to recruit investors.

In addition to its website and YouTube videos, Profit Connect relied on what they called "promoters" to tout Profit Connect and its substantial returns using their social media platforms. Sutton and Nicholas became two of the roughly 85 promoters recruited by Profit Connect. Profit Connect had a separate website devoted to the purported 1000+ "successful worldwide agents and affiliates," which was located at profitconnect-agent.com. The Profit Connect website for agents and affiliates states that they are paid up to 20% for referrals and can receive additional bonuses based on factors such as the number of referrals and monthly sales volume.

Profit Connect's bank records reflect that from May 2018 through April 12, 2021, over $3 million, or approximately 26% of the funds from investors in Profit Connect, were used to pay those who promoted Profit Connect. These "agents and affiliates" who promoted Profit Connect often used their social media platforms to publicize the Profit Connect wealth builder accounts on YouTube, Facebook, Instagram, Twitter and LinkedIn. Promoters often posted an excerpt or screenshot from the Profit Connect website on their social media showing 20%-30% returns (with monthly compounding interest) and they directed their followers to the Profit Connect website.

Many of the promoters with Profit Connect were financial professionals like Nicholas and Sutton. These financial professionals used both their authority with major investment companies like Allianz and their direct connections with customers of these investment companies to bring investors to Profit Connect. Utilizing promoters like Sutton and Nicholas, as well as other schemes, from May 2018 until the receivership was put into place, Profit Connect raised over $24 million from approximately 880 investors.

**C.     Sutton and Nicholas team up to identify investors for Profit Connect so that they can earn substantial fees.**

Nicholas and Sutton were both licensed by Allianz to sell life insurance and other annuity type products. Nicholas and Sutton, independently, had dozens of clients to whom they sold annuities and life insurance products. Most of their clients were not rich individuals—they were normal working people who had saved up enough money to make these stable, safe investments. Most, if not all of Nicholas' and Sutton's clients, wanted nothing more than to protect their investment and see it grow conservatively. None of them were out looking for a quick buck through a risky investment scheme.

Beginning in or around October 2020, Sutton became aware of Profit Connect. In or around that same time, Sutton contacted Nicholas and others and began talking about Profit Connect as

an investment vehicle for their clients. Sutton and Nicholas both understood that the more investors they brought into the Profit Connect platform the more they could make in fees. From the promoters' standpoint, this was set up as a classic multi-level marketing ("MLM") scheme. In an MLM scheme, the compensation plan usually pays out to participants from two potential revenue streams. The first is based on a sales commission from directly selling the product or service; the second is paid out from commissions based upon the wholesale purchases made by other sellers whom the participant has recruited to also sell product. In the organizational hierarchy of MLM companies, recruited participants (as well as those whom the recruit recruits) are referred to as one's downline distributor.

Sutton began talking to Profit Connect representatives in October 2020 to learn more about the platform and opportunity to generate fees. Through a letter dated November 1, 2020, which was described by Sutton as a "Letter of Intent", Sutton introduced his team, which included Nicholas, to Profit Connect. (*See* Exhibit 1). Sutton's team's objective was to partner with Profit Connect to raise funds for the platform—which, of course, meant fees for Sutton, Nicholas, and his team. In that letter, Sutton said that he and his team looked forward to continued conversations with Profit Connect to explore the following:

- regulatory risk of the Investment, including banking and securities risks;
- risk of loss in the Investment;
- operational standards of ProfitConnect (e.g. under what conditions would ProfitConnect leverage clients' deposited accounts, etc.);
- financial results of operations, including cash flow, profit and loss reports, and balance sheets;
- history of returns to clients;
- management and oversight of ProfitConnect, including its board of directors and executive team; and
- policies and practices for investment in and hedging against cryptocurrency, including any standards around percent of assets to be maintained in cryptocurrency and criteria for determining fitness of cryptocurrencies for investment.

*Winkler v. Sutton, Nicholas, Allianz* –First Amended Complaint

After making this introduction, a non-disclosure agreement ("NDA") was exchanged with Profit Connect prior to sharing information. Upon receiving the draft NDA, Sutton contacted two separate attorneys in the Salt Lake City area to review it. Neither of the lawyers moved fast enough for Sutton and both asked probing questions about the investment itself.

Rather than try to explain Profit Connect's business model so that the lawyers could provide advice on the NDA, Sutton asked Profit Connect to refer him a lawyer who understood Profit Connect so that they could move forward quickly with the NDA. Profit Connect put Sutton in contact with its primary lawyer Dale Hayes—a criminal DWI lawyer in Las Vegas--and asked him for a referral for Sutton. Eventually, Profit Connect and Sutton executed the NDA and they moved forward with their "due diligence" on Profit Connect, including visiting Profit Connect's data center in Las Vegas.

After executing the NDA and receiving information from Profit Connect about its investment strategy, Nicholas and Sutton began promoting Profit Connect to their clients using the identical sales pitches promoted by Profit Connect on its web videos and marketing materials. The marketing scam included claims that: (i) money would be "safe"; (ii) emphasized the ability to earn 15%-30% per year returns; (iii) promised that the funds would be invested in FDIC-insured accounts; (iv) informed them that there would be no fees associated with the investment; (v) represented that investing in Profit Connect was a better and safer investment than investing in IRAs, annuities, 401(k) plans, or other retirement plans; and (vi) claimed that their money could be withdrawn at any time.

Sutton and Nicholas, driven by their desire to earn fees under the MLM scheme, told investors that they had done a comprehensive investigation into Profit Connect and found it to be completely legitimate. In fact, Sutton prepared a series of professional promotional videos touting

his financial expertise, his investigation, his understanding of the business, and specifically articulating each of the false statements above to solicit investors. Upon information and belief, Nicholas was aware of these videos and participated, at some level, in putting them together.

**D.     Nicholas utilizes his position as a financial planner and agent of Allianz to identify and enlist investors for Profit Connect.**

Many of the investors in Profit Connect withdrew their investments under the negligent financial advice of professionals they trusted. Jeffrey Nicholas was one of these professionals and Kim McConal is an example of one of those investors. In the fall of 2016, Nicholas met with McConal who was an employee of Loop ISD. In McConal and Nicholas' initial meeting, McConal told Nicholas how she had money in CDs at a bank, and they further discussed how this money was earning little interest. McConal also informed Nicholas that she had inherited an IRA with Fidelity from her mother. After emphasizing to Nicholas that she was only interested in making *safe* investments, Nicholas advised McConal to move the CD funds to a conservative and diverse Allianz annual fixed index annuity ("Annuity") which would earn her solid returns, and to rollover the IRA to Allianz accounts as well. Nicholas assured McConal that this was the absolute best and safest investment for her funds. Trusting Nicholas, McConal accepted his advice and in September 2016, she entrusted Nicholas and Allianz with her retirement and investment funds. Nicholas invested the funds into an annuity with an initial cash surrender value of over $200,000.

Over the ensuing four-and-a-half-year period, Allianz and its agent Nicholas, who was operating under the assumed name of Nicholas Financial in an office located in Lubbock, Texas, developed a relationship of trust and confidence with McConal as her financial planners, advisors, and agents. McConal was very happy with the conservative investment returns over this period.

In the spring of 2021, McConal reached out and requested a meeting with Nicholas to discuss her future because she was considering retirement after almost 25 years of teaching. On

April 15, 2021, McConal met with Nicholas. At the meeting, Nicholas dismissed McConal's questions about investing in a possible 403(b) plan. Instead, Nicholas informed McConal that he and his friend and business partner, Troy Sutton, had discovered a new company in Las Vegas named Profit Connect that was offering incredible opportunities to investors.

Nicholas pitched Profit Connect to McConal emphasizing the high returns and FDIC-insured safety of the investment. McConal expressed reservations to Nicholas that such a high rate of return could be achieved. In response, Nicholas said that a 20% return on investment was not too much to expect because Profit Connect was using supercomputers to mine cryptocurrency and "making money hand over fist." McConal continued to express her reluctance to such a investment, stating that she was happy with her Allianz accounts' returns and that she needed to stay liquid so she could purchase a new vehicle in the near future. Nicholas continued to encourage and persuade McConal to utilize all of her Annuity and invest it with Profit Connect. Nicholas promised McConal that any investment in Profit Connect would be liquid in case she needed any of it at any time. After over an hour of convincing, McConal finally gave in because she trusted Nicholas and knew him to be a very savvy advisor and planner.

Nicholas proceeded to direct McConal to initiate the withdrawal of the entirety of her Annuity that very day. Nicholas advised McConal that she would incur both a penalty and a large income tax liability for taking these funds out of her investment early, but that these penalties and taxes would be overcome by the return on her new investment. Nicholas specifically advised McConal to withdraw her Annuity funds being maintained at Allianz, take the penalties, and pay the taxes because she would "make that up quickly."

In reliance on Nicholas, McConal initiated the Annuity withdrawal forms at Nicholas's insistence and direction via his laptop in that very meeting on April 15, 2021. On May 19, 2021,

Nicholas insisted that McConal go ahead and write him a check for over $200,000 Profit Connect investment so that he could send it to Profit Connect immediately upon the deposit of the funds from her Allianz Annuity.

At no point during this process did Allianz or any of its employees ever question or contact McConal about her request to withdraw funds, the fact that she was taking a penalty for doing so, or about the tax liability associated therewith.

On June 1, 2021, McConal received the Annuity funds and immediately informed Nicholas per his instructions. Accordingly, Nicholas sent McConal's funds totaling over $200,000 to Profit Connect. The check cleared on June 10, 2021. Unbeknownst to McConal, both Nicholas and Sutton received commissions for McConal's investment.

Less than two months after her investment, on August 24, 2021, McConal received a text and then a call from Nicholas asking her to come into his office sometime as soon as possible for a meeting. The meeting was arranged for the next day, August 25, 2021, at 6:00 p.m. CST.  When McConal arrived, she was greeted by Nicholas and Sutton, whom she was meeting for the first time. Sutton took the lead and made small talk for a while before informing McConal that he and Nicholas had "some bad news, but not all bad."  Sutton informed McConal that the Securities and Exchange Commission ("SEC") had seized control of Profit Connect and that all of Profit Connect's assets had been frozen. Nicholas and Sutton said it appeared that the investments were not FDIC-insured after all.

Understandably, McConal burst into tears at the news and asked, "how could this happen!?" Sutton replied that he had "assumed" Profit Connect was FDIC-insured because he had "seen some bank names on a business document." Nicholas added, "In hindsight, I should have told you to only invest $1,000.00."

*Winkler v. Sutton, Nicholas, Allianz* –First Amended Complaint

**E.     Sutton and Nicholas negligently and recklessly ignored the red flags around profit connect.**

The red flags around Profit Connect were obvious to any experienced investment advisor. For example, and without limitation: (i) Why would Sutton's lawyers question him about Profit Connect being a legitimate business when they were asked to review the NDA? (ii) Why would a purported artificial intelligence company utilize a DWI lawyer as its corporate counsel? (iii) Why should anyone trust B. Kovar, the CEO, with client money when he had previously been charged by the SEC in a different investment fraud? (iv) How could a company that allegedly mined for bitcoin be safer than a typical 401(k) investment plan or annuity? (v) If all investor funds could be withdrawn at any time, how would Profit Connect generate revenues to pay the promoters fees? and (vi) If the monies were being used to buy time on a supercomputer, how would they remain in FDIC-insured accounts?

In fact, in early May 2021, when Sutton and Nicholas were out raising money for Profit Connect, one potential stockbroker, presumptively another "promoter" to put into the MLM network, raised the question to Sutton about Profit Connect being a Ponzi scheme. Rather than investigate that concern, Sutton raised the issue directly with Profit Connect to develop a response. Profit Connect crafted a response for its promoters to use when investors posed questions about it being a Ponzi scheme. The fact was, Sutton and Nicholas were far more interested in earning fees for themselves through the MLM model than whether Profit Connect was a legitimate business. In fact, by June 10, 2021, just six months after beginning to entice their clients to invest in Profit Connect, Nicholas had earned commissions of $367,560 and Sutton had earned $41,017 in commissions. The red flags did not concern Sutton or Nicholas because they were not being paid on whether their client lost or made money - they were paid simply by bringing the money in to Profit Connect.

*Winkler v. Sutton, Nicholas, Allianz* –First Amended Complaint

In April 2021, Sutton was in regular contact with Profit Connect to coordinate marketing efforts. For example, in an April 29, 2021, text message from Sutton to Profit Connect, Sutton said "my team of financial professionals is going to bring more money than 95% of current affiliates combined!!! Not just big fish, but lots and lots of average Americans to fulfill the Big Data vision Brent talks about. We need Main St. USA and we'll get them." And they did get them. Nicholas and Sutton were able to convince approximately forty individuals to divest from secure investment vehicles such as annuities, profit sharing plans, retirement plans, insurance products, and savings accounts to "buy time" on the Profit Connect supercomputer. By the end of June 2021, Nicholas claimed he had generated $5 million of investor funds for Profit Connect.

**F.     Allianz's responsibility for the actions of its agents.**

During the spring of 2021, Sutton and Nicholas were agents licensed by Allianz. Allianz confirmed Nicholas' status as its agent by identifying him on annuity and insurance policy documents as a "financial professional" and directing customers to contact him directly with questions about their investments. Allianz therefore clothed Nicholas with actual and apparent authority to act on behalf of Allianz, and a prudent person would have been justified in believing that he was authorized by Allianz to perform all acts related to the annuity or policy, including but not limited to withdrawals and surrenders of the annuity or policy.

Allianz, through its authorized agents and otherwise, transacted business in Texas by selling annuities, variable annuities, or life insurance policies to McConal and others and by wrongfully recommending and processing withdrawal/surrender requests from McConal and possibly others' insurance products to move the monies into a Ponzi scheme. Allianz failed to adequately, reasonably, or diligently supervise its agents Nicholas and Sutton and negligently supervised them. A principal is liable for its agent's negligence and other torts under the doctrine

of *respondeat superior.* Nicholas and Sutton were acting as agents for Allianz during the time that Nicholas advised certain Allianz clients to withdraw annuity proceeds and to instead invest in a Ponzi scheme, and Allianz is liable for Nicholas and Sutton's wrongful actions.

### G. Profit Connect is put into receivership.

Not long after Sutton and Nicholas convinced approximately forty investors to put their money into Profit Connect—at least $2,112,400, they began complaining that Profit Connect was not paying their commissions. Profit Connect had no reasonable explanation. At that same time, some of Nicholas' clients were complaining that they could not see the money in their account on the web portal. Profit Connect was providing inadequate and misleading responses. On July 8, 2021, the SEC filed suit against Profit Connect, J. Kovar, and B. Kovar. After the SEC's lawsuit became public, Nicholas and Sutton started asking for a return of their clients' funds but to no avail. On August 6, 2021, Winkler was appointed as Receiver. At that point in time, Profit Connect's business was effectively shut down. Subsequent investigation has revealed that of the $24 million raised by Profit Connect, the majority of those funds were diverted to the Kovars for their personal use or to pay promoters such as Nicholas and Sutton. Based upon information currently available, individual investors will receive a partial return of their funds invested in Profit Connect but will not be made whole.

## V. Causes of Action

### A. Aiding, Abetting or Participating in Breach of Fiduciary Duties.

Sutton and Nicholas knowingly or recklessly aided, abetted, or participated in the breach of fiduciary duties. Specifically, the directors and officers of Profit Connect, including but not limited to J. Kovar, B. Kovar, and Eddie Kona, owed fiduciary duties to Profit Connect. As described herein, Profit Connect's directors and officers breached their fiduciary duties by causing Profit Connect to engage in inappropriate activity which led to an increase in liabilities to Profit Connect, and by assisting B. Kovar and his co-conspirators in misappropriating millions of dollars in assets from Profit Connect and otherwise misusing Profit Connect's funds in contravention of what was represented to Profit Connect's investor-creditors.

Sutton and Nicholas knew that Profit Connect's directors and officers owed fiduciary duties to Profit Connect, and Sutton and Nicholas were aware or should have been aware that these directors and officers were breaching their fiduciary duties by promising investment returns that were not achievable in the manner promoted. Sutton and Nicholas aided, abetted, and participated in these breaches of fiduciary duties by the conduct alleged herein, which assisted Profit Connect's officers and directors to exponentially increase the liabilities of Profit Connect and otherwise misuse Profit Connect's funds. As a result of Sutton and Nicholas aiding, abetting and participating in these breaches of fiduciary duty, Profit Connect, and therefore the receivership estate, suffered damages. In addition, because Nicholas was acting as Allianz's agent at the time of such breaches, Allianz is liable for Nicholas's conduct.

The directors' and officers' breaches of their fiduciary duties and Defendants' participation in these breaches were a proximate cause of actual damages to Profit Connect generally and to the Receivership Estate. Defendants knew or should have known that their aiding, abetting, or

participation in these breaches of fiduciary duties would result in extraordinary harm to Profit Connect and the Receivership Estate. Accordingly, the Receiver is entitled to recover exemplary damages in excess of the minimum jurisdictional limits of this Court.

**B.    Avoidance and recovery of Fraudulent Transfers under §§24.005(a)(1), (a)(2) and 24.006(a) of the Texas Uniform Fraudulent Transfer Act or under the common law (against Sutton).**

The Receiver is entitled to disgorgement of the funds transferred from Profit Connect, subject to the Receivership, to Sutton because payments constitute fraudulent transfers. Sutton received commissions from Profit Connect for introducing investors to Profit Connect. It is those commissions that are the subject of this fraudulent transfer claim.

The Receiver may avoid transfers made with actual intent to hinder, delay, or defraud creditors. "[T]ransfers made from a Ponzi scheme are presumptively made with intent to defraud, because as a Ponzi scheme is, as a matter of law, insolvent from inception." *Quilling v. Schonsky,* No. 07-10093, 2007 WL 2710703, at *2 (5th Cir. Sept. 18, 2007); *see also Janvey v. Alguire,* 628 F.3d 164, 176 (5th Cir. 2010) ("[A] Ponzi scheme 'is, as a matter of law, insolvent from inception.'"); *Warfield v. Byron,* 436 F.3d 551, 558 (5th Cir. 2006) (". . . [the debtor] was a Ponzi scheme, which is, as a matter of law, insolvent from its inception . . . The Receiver's proof that [the debtor] operated as a Ponzi scheme established the fraudulent intent behind transfers made by [the debtor].").

Profit Connect was running a Ponzi scheme and monies were transferred to Sutton with funds taken from unwitting investors in Profit Connect. At the time of the transfers, Profit Connect was insolvent or was likely to become insolvent as a result of such transfers. Further, Profit Connect did not receive reasonably equivalent value for the transfers made to Sutton. Profit Connect was engaged in a business or a transaction for which the remaining assets of Profit

Connect were unreasonably small in relation to the business. The Receiver, therefore, is entitled to disgorgement of the funds Profit Connect transferred to Sutton.

Under applicable fraudulent transfer law, the Receiver is entitled to attorney fees and costs for its claims against Sutton. *See, e.g.* Tex. Bus. & Com. Code Ann. §24.013. As a result, the Receiver requests reasonable attorneys' fees and costs for prosecuting its fraudulent transfer claim.

### PRAYER

For the reasons stated herein, Plaintiff asks that Defendants be cited to appear and answer for the claims asserted herein. Plaintiff seeks recovery of all actual damages, punitive damages, attorney fees, costs, disgorgement, and all other relief that it shows itself entitled to.

Respectfully submitted,

BUCK KEENAN, LLP
2229 San Felipe, Suite 1000
Houston, Texas 77019
T 713-225-4500
rpaddock@buckkeenan.com

BY: */s/ Robert Paddock*
**Robert Paddock**
State Bar No. 24002723

FIELD, MANNING, STONE
 HAWTHORNE & AYCOCK, P.C.
2112 Indiana Avenue
Lubbock, Texas 79410
T 806-792-0810
jpmanning@lubbocklawfirm.com
**J. Paul Manning**
State Bar No. 24002521

*Attorneys for Plaintiff*

*Winkler v. Sutton, Nicholas, Allianz* –First Amended Complaint